IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | No. 3:06-CR-110 |
| ) | (VARLAN/GUYTON) |
| LATAWYNE DEWRIGHT OSBORNE, ) | |
| ) | |
| Defendant. ) | |

## REPORT AND RECOMMENDATION

This matter is before the Court pursuant to defendant, Latawyne D. Osborne's Motion to Suppress The Arrest And Ultimate Fruits Of The Arrest [Doc. 34] regarding the seizure of two firearms and a quantity of controlled substances from the vehicle driven by the defendant. All pretrial motions in this case have been referred to the undersigned pursuant to 28 U.S.C. § 636(b) for disposition or report and recommendation regarding disposition by the District Court as may be appropriate. An evidentiary hearing was held on May 2, 2007. Assistant United States Attorney Brownlow Marsh was present representing the government. Attorney Philip Lomonaco was present representing the defendant, Latawyne D. Osborne ("Osborne"). The defendant was also present.

The defendant has been indicted [Doc. 1] on one (1) count of possession with intent to distribute cocaine base, a Schedule II controlled substance, a violation of 21 U.S.C. § 841, one (1) count of possession with intent to distribute cocaine hydrochloride, a Schedule II controlled substance, a violation of 21 U.S.C. § 841, and one (1) count of possessing two firearms in furtherance of drug trafficking crimes, a violation of 18 U.S.C. § 924(c). These charges arise out

1

of the seizure of certain items, namely controlled substances and two firearms, which were found in a car being driven by the defendant on July 27, 2006. Just prior to the seizure of these items, officers of the Knoxville Police Department ("KPD") had followed the car being driven by the defendant into the driveway of a residence, and then arrested the defendant on an outstanding arrest warrant for aggravated assault.

The defendant has moved to suppress all items of evidence seized from the automobile, alleging that KPD officers improperly and without probable cause searched the vehicle, seized the defendant's wallet from the closed, center armrest compartment of the front seat and used the identification card inside the wallet to identify the defendant before arresting him on an outstanding arrest warrant, and therefore, the items seized were obtained in violation of his Fourth Amendment rights; that the search of the car was not made incident to arrest, but was prior to arrest, and that defendant did not consent to the search. [Doc. 33]. In response, the government alleges that KPD officers had adequate grounds to follow the defendant's vehicle, stop the defendant, conduct a protective weapons sweep of the defendant's car, obtain from inside the car the defendant's identification card, arrest the defendant on the outstanding arrest warrant, and then seize the drugs and guns from the automobile the defendant was driving, pursuant to a standard search incident to arrest. [Doc. 36]. The government also has argued that since the vehicle was towed, an inventory search would have revealed the drugs and guns.

## I. FACTS

This Court made findings of fact in its Report and Recommendation [Doc. 29] on the defendant's First Motion To Suppress. Those findings of fact are incorporated herein by reference.

At the evidentiary hearing on this motion, the government called KPD Officer Lance Halseth ("Halseth") as its first witness. Halseth testified that he is a patrol officer with the KPD.

Halseth testified that he was present at the scene on the day in question. The officers were present in response to a "shots fired" call from police dispatch. He has reviewed parts of the videotapes from the KPD cruisers. He testified that he recognized his voice on a tape, and that he was calling records to get an NCIC check to see if the defendant had any outstanding warrants. On the tape, Halseth can be heard giving the defendant's name to records.

Halseth testified that he knew the name of the defendant to use in calling records, because one of the other officers at the scene handed him the defendant's I.D. Although not "one hundred percent (100%) positive," Halseth testified that he thinks the I.D. was "an I.D. card," not a driver's license. Also, Halseth thinks that the I.D. card was by itself, but he wasn't really sure about whether it was really by itself or whether it was in a wallet when he saw it.

Halseth testified that he did not search the defendant's vehicle until after records advised that there was an outstanding arrest warrant on the defendant. Halseth personally did not search the vehicle prior to running the records check.

On cross examination, Halseth testified that he was in the second KPD cruiser to arrive at the scene. Halseth testified that when he arrived, the defendant was outside his car, with his hands up. KPD Officer Elizabeth Vail was in front of the defendant, approaching the defendant with her gun drawn. Officer Vail arrived at the defendant first and ordered the defendant onto the ground. Halseth testified that he, Officer Vail, and Officer Chris Jones, then surrounded the defendant and handcuffed the defendant for officer safety. After being handcuffed, the defendant was allowed to sit on the ground.

At that point, according to Halseth, one of the officers on the scene, and perhaps Halseth, said something to the effect of "I'm going to look into the car for the gun." Halseth testified that either he or one of the other officers on the scene then did a "protective sweep" of the car for guns. Halseth testified that he really is not sure if he even was the one who did this protective sweep. Halseth testified that the purpose of the protective sweep was to see if there was a gun in plain view in the vehicle, because this was a call of shots fired involving the vehicle. According to Halseth, the main focus of the officers on the scene was to detain the defendant until they were able to ascertain what was going on.

Halseth again stated that he did not know who got the defendant's wallet, and further, he did not know where the defendant's wallet came from.

Halseth testified that he found out the identity of the defendant by looking at the defendant's identification card. Halseth testified that he recalls another officer referring to the defendant as Latawyne, and based on that he supposed that the other officer knew the defendant. As for Halseth, however, the only reason he ran the defendant's name through records was because someone gave him an identification card.

The videotape from Halseth's cruiser was played in court. Halseth testified that he could not understand the words on the videotape, and he stated that the videotape does not show anyone entering the defendant's vehicle. Still, he testified that it was a possibility that someone looked into the defendant's vehicle for a gun. This was before the identity of the defendant was learned.

Halseth then testified that perhaps Officer Chris Jones handed the defendant's I.D. to him. Again, Halseth testified that he believed it was an I.D. card, not a driver license.

4

The government's second witness was KPD Officer Elizabeth Vail ("Vail"). Vail testified that she reviewed the cruiser videotapes on the day of the hearing. Vail testified that from looking at Officer Jones' tape, that Officer Jones was talking to the defendant, and that Jones referred to the defendant by name. Vail was not clear, however, whether Officer Jones referred to the defendant by his first name or his last name, or whether Jones asked him his name.

The videotape from Vail's cruiser was played in Court. Vail testified that the defendant was handcuffed and detained immediately upon Vail approaching him at the scene. Vail testified that at that time, officers were investigating a report of shots fired.

Vail said that she does not recall any officer on the scene saying, "I'm going to look for a gun." Vail thinks that there may have been a discussion about looking for white paint on the defendant's car.

Vail testified that she does not know who obtained the defendant's identification, and she does not know where the defendant's identification was found.

The government rested and the defendant, Latawyne Osborne, testified. He said that he has seen the cruiser videos. He testified that when the police arrived, he got on the ground. Handcuffs were put on him and he was patted down. He said that he saw one officer go to the driver's side of his vehicle and open the door.

He testified that he did not have his I.D. in his pocket. He testified that it was in the armrest compartment of the car between the front seats. He testified that the armrest was closed, and officers had to open the top of the armrest to get the I.D. out of it. He testified that he told officers that his name was "Twayne." Osborne also testified that after the officers got his identification out of the car, then they searched him.

5

On cross examination, Osborne testified that he called the police with regard to this incident, because someone hit his car. He said that the officer asked him his name, and the defendant said "Twayne." He testified that he did not give the police officer his last name.

Osborne testified that his identification was a Tennessee driver license. He said that it was in between the seats in the front, that there was a lot of trash in the armrest compartment and that the identification was also in the armrest. Osborne testified that he did not give officers permission to go into his car. However, Osborne said that he was concerned about his child. The child was in a car seat in the back seat of the car. With regard to the child, Osborne did ask Officer Vail to get the child out of the car. However, Vail did not remove the child from the car.

Osborne testified that his billfold was in the armrest compartment of the front seat, and his driver's license was in the billfold. He specifically testified that his driver's license was inside the billfold. Osborne also testified that you have to push a button to open the armrest, and then lift the top in order to remove something from the armrest compartment.

## II. ANALYSIS

The Fourth Amendment protects citizens against unreasonable searches or seizures. U.S. Const. amend IV. The defendant contends that the officers who immediately searched his car while he was being detained, outside of his car, for investigation of a shots fired call, and seized his wallet from the closed armrest compartment, did so in violation of his Fourth Amendment rights, because they lacked probable cause. He further contends that because he was arrested based on the I.D. removed from the car, the evidence seized post-arrest from the car was seized illegally. The government contends that the defendant's I.D. was found during a lawful protective sweep of the

defendant's vehicle, and that the I.D. was taken as a reasonable way to identify the defendant while he was being detained as part of the investigation.

**A. Propriety of Seizure and Search**

In its Report and Recommendation filed April 3, 2007 [Doc. 29], the Court concluded that the stop of the defendant's vehicle was proper. By the present motion, the Court is asked to re-examine the propriety of the events following the stop. The defendant contends that even if properly stopped, the manner in which he was arrested was improper, because the seizure and search of the defendant's vehicle went beyond a "protective sweep" when his billfold, containing his I.D., was taken from the car. The defendant argues that he was out of his vehicle with his hands raised when Vail, with her gun drawn, ordered him to the ground and handcuffed him. He argues that he was detained for questioning while at the same time officers searched his car, and then he was arrested using the I.D. obtained through the vehicle search. The government argues that defendant was legally placed under arrest, and that the defendant's vehicle was properly searched incident to that arrest.

If an officer has a reasonable belief that the defendant is dangerous, the officer may order the defendant to get out of the car and may detain the defendant at gunpoint during an investigatory stop. See United States v. Hardnett, 804 F.2d 353, 357 (6th Cir. 1986) (holding that officers were justified in blocking the defendant's car, approaching with guns drawn, and ordering the occupants out of the car as a part of the Terry stop based upon a tip that the occupants were armed). "The mere use or display of force in making a stop will not necessarily convert a stop into an arrest" where the display or use of arms is viewed as "reasonably necessary for the protection of

7

officers." Id. at 357; United States v. White, 648 F.2d 29, 34-35 (D.C. Cir. 1981). In this case, Officer Vail was investigating a complaint of shots fired. The timing, location and description of the defendant's vehicle matched the description of the suspect vehicle given by dispatch. Based on this information, the Court finds that Officer Vail possessed an articulable and objectively reasonable belief that the defendant was potentially dangerous, making her display of arms, as she approached the defendant, reasonably necessary.

Once the defendant was handcuffed, however, the defendant was not questioned in a reasonable manner as to his identity for a records check. In fact, there is no evidence in the record that any officer on the scene asked the defendant for his last name. Instead, the uncontradicted testimony of the defendant is that an unidentified officer went into his vehicle, opened the front seat armrest compartment, removed a billfold, and obtained the defendant's I.D. from it. The unidentified officer gave the I.D. to Officer Halseth who used that I.D. to call records and learn of the outstanding warrant for the defendant.[1] It was than that the defendant was arrested, the vehicle searched again, and a firearm found.

The Court previously held that the stop of the defendant, his detention, and the pat-down of the defendant for officer safety were all proper. It also was lawful and reasonable, under all of the circumstances, for officers to do a protective sweep of the defendant's vehicle to make sure that there were no persons or weapons inside of the vehicle which could pose a threat to officers or members of the public. Michigan v. Long, 463 U.S. 1032, 1051 (1983).

---

[1]These findings of fact, it should be noted, contradict the following, more limited finding made in the Report and Recommendation filed on April 3, 2007 [Doc. 29]: "Once the defendant was handcuffed, the defendant was questioned in a reasonable manner as to his identity for a records check."

8

The issue now before the Court, and which was not an issue raised by the defendant's first suppression motion, concerns the defendant's I.D. card, which, according to the defendant's uncontroverted testimony, was inside of a billfold, which, in turn, was inside of a close armrest compartment in the center of the front seat of the vehicle. The defendant argues that the billfold, plainly not being a threat to officer safety, should not have been seized and searched for the defendant's identity. The government argues that the defendant cannot complain because, "standard police practices" require the officers to identify the defendant, and the defendant has no reasonable expectation of privacy in his own identity. The government adds that it was the defendant who called for police assistance, which, according to the government, further supports its position that the disclosure of his identity was inevitable. [Doc. 36].

In <u>United States v. Navarro-Diaz</u>, 420 F.3d 581 (6th Cir. 2005), the Court of Appeals for the Sixth Circuit, in a case with facts somewhat similar to the present case, addressed the issue of whether a defendant's identity could be suppressed. In <u>Navarro-Diaz</u>, police officers were called to a motel to investigate the odor of marijuana coming from a guest room. The officers found five (5) men in the room, one of whom admitted to possession of marijuana. The man gave a bag of marijuana to the officers, and the officers then asked each man his identity. All but one, Navarro-Diaz, produced identification documents.

Navarro-Diaz did not have identification on him. Instead, he orally provided to the officers a fake name and fake date of birth, claiming that Ohio had issued a drivers license to him. A records check by the officers quickly revealed that the information given by Navarro-Diaz was false.

9

Meanwhile, one of the other men, Juan Candelez, was discovered to be carrying a concealed firearm. Officers arrested Candelez for possession of a concealed weapon, and then asked him for permission to search his car, parked in the motel's lot. Candelez consented, and the search of his car revealed a wallet containing an identification card for Navarro-Diaz. Officers confronted Navarro-Diaz with the I.D., and he admitted that to be his identity. Officers then ran a records check and learned that Navarro-Diaz had an outstanding warrant, and they arrested him. Subsequently, he was indicted for being an illegal alien who had previously been deported and re-entered without permission.

Navarro-Diaz moved to suppress the evidence obtained from him at the motel, specifically, his identity. The District Court denied the motion, and the Court of Appeals affirmed. Citing case law from other circuits, the Appeals Court stated that, "Identity evidence is inherently different from other kinds of evidence," and "the identity of defendants is not suppressible under the exclusionary rule." The Court held that Navarro-Diaz could not make a Fourth Amendment claim based on the officers' discovery of his identity. 420 F.3d at 586-87. The Appeals Court was guided by United States v. Crews, 445 U.S. 463, 470-74 (1980), wherein the Supreme Court ruled that a defendant could be brought to trial even though he was illegally arrested. The Crews Court held that, although the "exclusionary sanction applies to any 'fruit' of a constitutional violation," a defendant, as opposed to physical evidence, such as drugs, "is not himself a suppressible 'fruit'." Id. See also, United States v. Arias, 678 F.2d 1202, 1203-1205 (4th Cir. 1982) (where police made unlawful stop of van, learned identities of occupants, and later used the identities to tie the occupants to area crimes, the identities were not suppressible under exclusionary rule, even though identities were discovered solely because of the unlawful stop).

Guided by the Sixth Circuit's reasoning in Navarro-Diaz, the Court finds that the Motion To Suppress is not well taken. The defendant Osborne's "identity", even if obtained as a result of a search which went beyond the reasonable parameters of a protective sweep, can not be suppressed. The defendant's identity is not evidence constituting a fruit of the poisonous tree. In short, the officers had a right to obtain the defendant's identity. However, better procedures for obtaining the defendant's identity perhaps were available. For example, Officer Vail or Officer Halseth, upon detaining the defendant, simply could have asked him his full name, followed by a request to confirm what he said against his drivers license or identification card. If that had been done in this case, perhaps the defendant simply would have directed the officers to the armrest compartment to retrieve his identification. The bottom line remains, however, that the defendant's identity is not suppressible in this case.

Once the officers had the defendant's identity, a records check on the defendant revealed an outstanding arrest warrant. Thus, the Court finds that the officers had probable cause to arrest the defendant. See United States v. Padro, 52 F.3d 120, 122 (6th Cir. 1995) (stating that probable cause has been defined as "reasonable grounds for belief, supported by less than prima facie proof but more than suspicion"). Having found that there was probable cause to make the arrest, the Court also finds that the search of the defendant's person and the defendant's vehicle incident to his arrest, and the inventory search of the defendant's vehicle preparatory to impounding the vehicle were lawful.

Assuming there is probable cause to arrest, the police may make a full search of the suspect for both weapons and evidence as a search incident to arrest. See United States v. Robinson, 414 U.S. 218, 235 (1973); United States v. Hughes, 898 F.2d 63, 64 (6th Cir. 1990) (upholding

seizure of crack cocaine from match box in defendant's hand as valid search incident to arrest). Additionally, a warrantless inventory search of the possessions of an arrested person held in custody is an "entirely reasonable administrative procedure," by which a defendant's Fourth Amendment rights are not violated. United States v. McCory, 102 F.3d 239, 240-41 (6th Cir. 1996), cert. denied, 520 U.S. 1180 (1997) (upholding inventory search of defendant's wallet while he was held in temporary detention and seizure of pawn ticket which led to stolen rifles); see also United States v. Staula, 80 F.3d 596, 603 (1st Cir. 1996) (holding that "when a driver is lawfully arrested and thus disabled from continuing his journey, the Constitution permits the police to carry out a routine inventory examination incident to impounding the vehicle").

In the present case, the defendant contends that the evidenced seized from the vehicle he was driving should be suppressed. The Court has found that the officers had probable cause to arrest the defendant. Thus, the officers were entitled to make a full search of the defendant for both weapons and evidence as a search incident to arrest. Additionally, once the defendant was arrested and placed in custody, the officers were entitled to impound the defendant's vehicle and conduct an inventory search of the vehicle's contents. United States v. Robinson, 390 F.3d 853, 871 (6th Cir. 2004); South Dakota v. Opperman, 428 U.S. 364, 375 (1976) (holding that an inventory search of an automobile prior to its impoundment, pursuant to standard police procedures, is reasonable under the Fourth Amendment). The officers, under the totality of the circumstances, after finding drugs on the defendant's person, had probable cause to believe that the vehicle would contain evidence of a crime. United States v. Pasquarille, 20 F.3d 682, 689-690 (6th Cir. 1994). The Court finds that the evidence seized, namely cocaine, firearms and cash, was legally seized incident to the defendant's arrest and incident to the impounding of the defendant's vehicle. Accordingly, the fact

that the defendant did not give consent to search his vehicle is of no consequence in the present case. Thus, the defendant's Fourth Amendment rights were not violated. As such, the Court recommends that the District Court deny the defendant's request to suppress his arrest and the evidence seized incident to his arrest.

### III. CONCLUSION

After carefully considering the evidence introduced during the course of the evidentiary hearing, and after reviewing the relevant legal authorities, it is clear that there is no basis to suppress any evidence seized in this case. For the reasons set forth herein, it is **RECOMMENDED** that defendant's Motion to Suppress The Arrest And Ultimate Fruits Of The Arrest [**Doc. 34**] be **DENIED**.[2]

                                          Respectfully submitted,

                                            s/ H. Bruce Guyton
                                          United States Magistrate Judge

---

[2] Any objections to this report and recommendation must be served and filed within ten (10) days after service of a copy of this recommended disposition on the objecting party. Fed. R. Crim. P. 59(b)(2). Failure to file objections within the time specified waives the right to review by the District Court. Fed. R. Crim. P. 59(b)(2); see also Thomas v. Arn, 474 U.S. 140 (1985) (providing that failure to file objections in compliance with the ten-day time period waives the right to appeal the District Court's order). The District Court need not provide de novo review where objections to this report and recommendation are frivolous, conclusive, or general. Mira v. Marshall, 806 F.2d 636, 637 (6th Cir. 1986). Only specific objections are reserved for appellate review. Smith v. Detroit Federation of Teachers, 829 F.2d 1370, 1373 (6th Cir. 1987).